# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00529-CR

**Reginald Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-21-904023, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Reginald Williams of the offense of murder and assessed punishment at 25 years' imprisonment. *See* Tex. Penal Code § 19.02. The district court sentenced Williams in accordance with the jury's verdict. This appeal followed.

Williams's court-appointed counsel on appeal has filed a motion to withdraw and a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no arguable grounds to be advanced. *See id*. at 744-45; *see also Penson v. Ohio*, 488 U.S. 75, 81–82 (1988); *Garner v. State*, 300 S.W.3d 763, 766 (Tex. Crim. App. 2009). Counsel has certified to this Court that he has provided Williams with a copy of the motion and brief, advised him of his right to examine the appellate record and file a pro se response, and supplied him with a form motion for pro se access to the appellate record. *See Kelly v. State*,

436 S.W.3d 313, 319-20 (Tex. Crim. App. 2014). No pro se brief or other response has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson*, 488 U.S. at 80; *Bledsoe v. State*, 178 S.W.3d 824, 826–27 (Tex. Crim. App. 2005); *Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). The indictment alleged in three paragraphs that on or about October 13, 2019, Williams either (1) intentionally or knowingly caused the death of Emmett Infante Ramos by shooting him with a firearm; (2) committed an act clearly dangerous to human life, with intent to cause serious bodily injury, that caused the death of Ramos by shooting him with a firearm; or (3) committed or attempted to commit the offense of robbery and, in the course of and in furtherance of and in immediate flight from the commission of that offense, committed an act clearly dangerous to human life that caused the death of Ramos by shooting him with a firearm. *See* Tex. Penal Code § 19.02(b)(1), (2), (3).

The jury heard evidence that Ramos was killed during a drug deal. Ramos's girlfriend, Deisy Calderon, testified that Ramos had arranged to sell THC cartridges to a buyer on the night that he was killed. Ramos and Calderon drove to the location specified by the buyer and, upon arrival at that location, Ramos got out of the car and walked to the back of the vehicle with the cartridges. Calderon remained inside the car and heard male voices outside. Shortly thereafter, Calderon heard Ramos say, "Chill, chill" in a loud and scared voice as he walked to the front of the car and opened the driver's side door. Calderon looked up from her phone, saw "like a flash" and heard "a shot go off," and saw "two bodies," one "bigger than the other," immediately behind Ramos. The two individuals "took off running" while Ramos fell to the ground, telling Calderon that he had been shot and asking her to call the police. Calderon called

2

911, and the police and paramedics arrived shortly thereafter. Ramos was transported to a hospital, where he died. The cause of death was a gunshot wound to Ramos's back.

During the investigation into the shooting, police searched Ramos's phone and determined that the person to whom Ramos had arranged to sell the THC cartridges was Elijah Malone. Text messages between Ramos and Malone, in which they discussed the sale of the cartridges, were admitted into evidence. The last text message between them was at 11:53 p.m. on the night that Ramos was killed. Approximately four minutes later, Calderon called 911. Police executed a search warrant at the apartment where Malone lived. Inside his room, they found "five unopened Rove THC cartridges in [] rectangular boxes." Rove was the brand of cartridges that Calderon testified Ramos had in his possession that night.

Police interviewed Malone's then-girlfriend, Dejza Zeigler, who told them that Malone was with Reginald Williams when she picked him up the day after the shooting. At trial, Zeigler testified that she had picked Malone up at the apartment where "Reggie's baby momma" lived. That woman was identified as Jayla Sifuentes, who testified that Williams and Malone were "chilling" at her apartment the night of the shooting and that they left her apartment together at the same time, sometime after 11:00 p.m., without telling her where they were going. Sifuentes testified that they returned to her apartment later that night, with Malone "running through [the] door" first and "breathing heavily" and Williams coming through the door shortly thereafter, also "breathing heavy" and looking "shocked, too, like he just wasn't there." She also testified that Malone and Williams were holding THC cartridges when they returned to her apartment and that they told her that they had robbed someone during a drug deal. Sifuentes recounted that Malone and Williams slept at her apartment that night and that Malone's girlfriend picked him up the next day.

3

Later during the investigation, the police arrested Williams and searched the residence where he lived. During the search, officers discovered additional THC cartridges that matched the description of those that Ramos had in his possession when he was shot. Other evidence admitted at trial included surveillance camera footage taken from an auto shop near the location of the shooting that showed two men, matching the physical descriptions of Malone and Williams, walking in the direction of where the crime occurred and then, several minutes later, running away in the opposite direction; a copy of the search history from Williams's cell phone, which showed that on the day of the shooting, he had been searching for information on firearms that might have been used during the shooting;[1] and a copy of a news article found on Williams's phone related to the shooting and other searches on his phone for an "update on deadly shooting [A]ustin," made in the days immediately after the shooting, before Williams was arrested.

At the conclusion of trial, the district court charged the jury on the law related to the offense of murder, including instructions on the law of parties. The court's charge tracked the allegations in the indictment, and the jury found Williams guilty of murder as charged. Following a hearing on punishment, at which witnesses for both the State and the defense testified, the jury assessed punishment at 25 years' imprisonment, and the district court sentenced Williams accordingly as noted above.

---

[1] The police were unable to locate or identify the actual firearm that was used to shoot Ramos.

We have reviewed the record and counsel's brief. We agree with counsel that the appeal is frivolous and without merit. We find nothing in the record that might arguably support the appeal. We grant counsel's motion to withdraw and affirm the judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:   June 30, 2023

Do Not Publish